## WEAVER BROS. v. TEMPLEMAN BROS., Inc. *

### No. 14288.

Court of Appeal of Louisiana. Orleans.

Dec. 19, 1932.

O'Niell & O'Niell, of New Orleans, for appellant.

Alex. W. Swords, of New Orleans, for appellee.

HIGGINS, J.

This is a suit by a consignor against a consignee to recover the sum of $449.94 for damages said to have resulted because of the wrongful rejection of a carload of dressed cypress lumber (Shop No. 1) on July 22, 1929. The defendant admits ordering the lumber and that it was delivered, but avers that it was justified in rejecting the consignment because more than a substantial part of the merchandise was defective, and particularly the 4x4 pieces, which were poorly machined, showing indentations from the chips which were permitted to remain on the boards as they passed through the roller of the planing machine, and the 8x4 pieces of lumber which were also poorly machined, being roughed up by the dressing machine on account of the green or wet condition of the boards at the time they were dressed and still being green or wet at the time of delivery. The defendant also reconvened for the sum of $61.55, covering unloading, storing, and hauling of the lumber in question.

There was judgment in favor of the defendant on the main demand, dismissing the plaintiff's suit, and also on the reconventional demand, as prayed for, and the plaintiff has appealed.

The record shows that Weaver Brothers of Shreveport operated a sawmill and were represented in New Orleans by Baldinger & Vernon, their factory agents. On July 10, 1929, Baldinger & Vernon secured an order from the defendant, a lumber dealer in New Orleans, for a shipment of dressed cypress lumber (Shop No. 1), consisting of pieces designated as 4x4, 5x4, 6x4, and 8x4. This material was to be used immediately or in the near future for manufacturing screen doors and screen window frames. This carload of lumber was shipped on July 16, 1929, and arrived in New Orleans on the 22d, when it was rejected by the defendant because the 4x4s showed indentations which were made by the chips not being removed from the pieces as they were being planed, and the 8x4s were roughed up, or did not show a smooth surface, because they were dressed while still wet or green. Baldinger & Vernon were notified by the defendant of its refusal to accept delivery and they, by telegram, notified the plaintiff thereof.

In order to avoid demurrage charges plaintiff instructed Baldinger & Vernon to have the defendant unload the lumber at defendant's yards at the plaintiff's cost, and, after considerable correspondence, several months later sent two of its factory men to inspect the lumber with Mr. Templeman, but the parties were again unable to arrive at any amicable settlement, and, after further correspondence in which plaintiff insisted the lumber was up to grade and defendant main-

*Rehearing denied January 16, 1933.

tained it was defective, on May 3, 1930, the plaintiff requested the National Hardwood Lumber Association's inspector to make an inspection of the lumber, which was still in the defendant's lumber shed. The inspector made his report on May 12, 1930, which showed that the lumber as a whole was substantially up to grade, but the report did not cover the questions of the roughed-up features of the boards as a result of being machined while in a green or wet condition, and the moisture content thereof. The lumber was thereafter sold at a loss and this suit instituted on January 22, 1931, to recover the alleged losses.

It is conceded by both sides that, when No. 1 shop dressed cypress lumber is ordered, it is understood by the trade that commercially dry lumber (meaning lumber that would be ready for manufacturing purposes immediately or within a reasonable time after being dressed) will be shipped, and not wet or green lumber, which is permissible only where the order is for rough lumber.

It is admitted that the 5x4 and 6x4 pieces of lumber were without defects and that the defendant signified its willingness to accept this lumber, but that the plaintiff refused to accede thereto. It is also admitted that both the plaintiff and defendant belonged to the National Hardwood Lumber Association, which was an organization primarily formed for the purpose of amicably settling disputes between its members by having its inspectors determine the grade of the lumber in dispute.

When the controversy first arose, the plaintiff and the defendant were both in favor of an inspection by the association's inspector, but the plaintiff wanted to limit the inspection to the grade of the lumber only, while the plaintiff wanted the inspection to cover the grade of the lumber, manufacturing defects, and whether or not the lumber was wet or green when manufactured and delivered.

Defendant produced several witnesses, including the salesman of Baldinger & Vernon, who secured the order from the defendant, as well as Mr. Vernon, who testified in effect that the 4x4 pieces of dressed cypress lumber were defective on account of the indentations made by the chips in carelessly dressing the cypress; that the 8x4 lumber was green and did not dress smoothly, but roughed-up because it was wet; that, when the car was unloaded at defendant's place of business, a number of pieces of the 8x4 were ripped in two, which showed that the 8x4 lumber was green or wet.

To offset this evidence the plaintiff offered the testimony of three of its employees, two other lumber experts, and Mr. C. E. McSmith, the National Association's inspector, all of this testimony tending to show that the lumber was up to grade, except for a small percentage thereof, for which the plaintiff was not making any claim. Mr. McSmith in his report did not go into the question of defective machine work or manufacture, but in his testimony stated that he did notice shaving marks on some of the lumber, which he degraded when it was of a serious character. But it is not pretended that he examined the lumber for defects, which might have been caused by dressing the 8x4 lumber at the time that it was green or wet and for moisture content thereof. The three employees of the plaintiff testified that the 8x4 lumber was commercially dry. To corroborate their testimony that the lumber was dry the railroad bills of lading showing the gross weight of the lumber were introduced in evidence, together with the National Association's rules showing the approximate weight of dry cypress per thousand feet. From these two circumstances and by mathematical calculation, plaintiff sought to show that the weight of the lumber shipped was several thousand pounds less than an ordinary car of dressed dry cypress and consequently that the 8x4 pieces could not have been wet or green, as defendant's witnesses say. But the weight of this evidence and the strength of this contention was considerably weakened when defendant showed that all of the other pieces of lumber in the car were of light weight, except the 8x4 pieces, and, as there were only 2,750 feet of these heavy pieces out of a total of 17,499 feet in the car, the plaintiff's logic was faulty in that such reasoning would only be applicable where the whole carload of lumber consisted of 8x4 pieces.

As we view the situation, when the trouble developed either party, under the National Association's rules, had a right to demand an immediate inspection of the lumber in accordance with its rules. Neither party insisted upon its rights, but attempted to settle the matter amicably by negotiations between themselves. The result of this was that the National Association's inspector did not make his examination and report until nearly ten months after the lumber was delivered to the defendant. While it is true that this report shows that the lumber was substantially up to grade, it does not cover fully the controverted question as to the faulty dressing of the lumber and fails entirely to cover the question of the green, or wet condition of the 8x4 lumber at the time it was dressed and delivered. Of course the association's inspector's examination, having been made ten months after the lumber was delivered, it was impossible, even if he had so desired, to have made an inspection as to the moisture content of the lumber as of the date of delivery. Several of the witnesses who testified for the plaintiff stated that when the lumber was delivered a number of the 8x4 pieces were ripped open and were found

914

to be green, or wet. The salesman who secured the order and another salesman, as well as Mr. Vernon, a member of the firm and agent for the plaintiff's mill, witnessed this test, and testified to that effect for the defendant.

The trial court, after considering all of the correspondence between the parties and hearing the testimony of the witnesses, concluded that the defendant had shown that a substantial part of the 4x4 and the 8x4 lumber was defective in the respects claimed, and therefore it was justified in refusing to accept delivery of the lumber.

The case was fully and ably tried on both sides, and, after carefully reading the record, we feel that the judgment is correct.

For the reasons assigned the judgment is affirmed.

Affirmed.